UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

MYRA WAKHAM                                                                                           Plaintiff

vs.                                                                              Civil Action No. 1:04CV207

GLENN BURGESS, WILLIAM BOLTEN,
CHARLIE BROWN, DAVID MERIDETH, and
CHARLES TERRY, in their individual capacities                                         Defendants

**ORDER**

This cause comes before the court on the motions of various defendants for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiff Myra Wakham has responded in opposition to the motions, and the court, having considered the memoranda and submissions of the parties, concludes that, in light of the recent addition of several defendants to this action, additional discovery is required and that the motions for summary judgment should be dismissed without prejudice.

This case presents a truly mysterious and intriguing set of facts. Plaintiff Myra Wakham filed this action against the Desoto County Sheriff's Department, Desoto County Metro Narcotics Unit, Desoto County, Mississippi, the City of Hernando Police Department, as well as various individual officers (some of whom were only recently added to the litigation), seeking recovery for alleged due process violations arising out of the Desoto County Sheriff's Department's investigation into (and possible role in) the death of her son, Jonathan W. Wakham. On July 7, 2001, Wakham was killed in an (apparent) one-vehicle accident on Byhalia Road in Desoto County. In her original complaint, plaintiff asserted a number of allegations of possible

involvement, or knowledge, of Sheriff's Department personnel in her son's death, including that:

> - The Desoto County Sheriff's Department "claims that it has lost the photographs that it took concerning the incident" and that it "does not know the whereabouts of the two officers" who were at the scene of the accident.
> - Because of the damage apparently done to the vehicle of the deceased, it appears unlikely that the vehicle voluntarily left the road, and it appears likely that the vehicle was being pursued.
> - Prior to his death, Wakham had related to plaintiff that narcotics officers of the "defendant" had been placing pressure upon him to become an informant.
> - An eye witness, Stephanie Guest, has informed plaintiff that she saw a vehicle matching the description of Wakham followed closely by two Sheriff's department cars travelling at a high rate of speed. She made this observation approximately two minutes before plaintiff's son left the highway and crashed.
> - Based upon the above facts, there is probable cause to believe that the Desoto County Sheriff's Department's deputies were involved in some manner in Wakham's death.

Based upon these allegations, plaintiff filed suit in this court on July 3, 2002, seeking recovery for violations of her constitutional "liberty" rights. On November 8, 2004, this court granted the motions of the county defendants for summary judgment, based upon a finding that plaintiff had failed to produce evidence of any official county custom or policy so as to impose municipal liability under *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-2038, 56 L. Ed. 2d 611 (1978). The court subsequently dismissed the City of Hernando Police Department, and the sole remaining defendants before the court are current or former individual officers sued in their individual capacities.

In its prior order granting the county defendants' motion for summary judgment, this court discussed in detail the facts which, in its view, served to establish fact issues regarding whether there was law enforcement involvement in Jonathan Wakham's death. Specifically, this court wrote as follows:

> The court's reluctance to dismiss this action arises from this court's belief

that plaintiff has submitted proof which, at the least, establishes genuine fact issues regarding a possible cover-up by sheriff's department employees of their involvement in the accident which led to her son's death. Perhaps the strongest evidence of the possible involvement of sheriff's department employees in the accident in this case is the testimony of witness Stephanie Guest. Guest testified in her deposition that she observed a vehicle matching the description of Wakham's vehicle being followed by two Desoto County sheriff's vehicle only minutes before the crash and approximately a mile from the accident site. Specifically, Guest testified as follows in her deposition:

> Anyway, as I approached the four-way stop, I saw another vehicle in front of me through the intersection, and I saw another car approaching from my right-hand side. When the car stopped at the stop sign, I noticed that it was a dark maybe burgundy, red, plum color, somewhere around in there. It was two doors, so I just felt that it was a mid-sized car. The car went - passed in front of me. As the car got in front of me, I noticed another set of headlights coming, so I just stayed stopped at the stop sign and there were two sheriff patrol cars coming behind. Neither one of them stopped, they went on through. And I just sat there and waited. I remember I had a very uneasy feeling for some reason, so I just sat there for a few minutes.

Guest testified that the sheriff's patrol cars were following within "a few seconds" of the dark-colored vehicle and that it "looked to me as if they were intended to keep up with the car, but not in a pursuit-type thing." Guest testified that, while she was originally planning to travel the route on Byhalia Road taken by the patrol cars, she elected against it, deciding that, since she had her children with her, she did not wish to "get in the middle of something." Defendants do not contest that Wakham's vehicle was a maroon-colored, two-door Cadillac Coupe Deville, nor do they contest that the accident occurred on a stretch of Byhalia Road approximately a mile from the point where, Guest testified, she observed sheriff's patrol cars closely following a vehicle similar to that driven by Wakham.

Plaintiff has also submitted evidence, including testimony from accident reconstructionist Lamon Griggs, that her son's vehicle was forced off the road after it was rammed from the rear by a white car equipped with bumper guards similar to those used by law enforcement patrol cars. Plaintiff also notes that Mississippi Highway Patrol Sergeant Peter T. Clinton, a Certified Accident Reconstructionist, concluded in his (apparently) official report for the Mississippi Highway Patrol that the trunk area on Wakham's vehicle "displayed two indentations that measured approximately two feet between each indentation" and that these indentations appeared to have been made from a white vehicle with protruding bumper guards or a vehicle mounted with a push bumper.

Defendants have cast serious doubt upon the "push bumper" portion of plaintiff's proof, submitting that only one of their vehicles was fitted with a push

3

bumper and that this vehicle was not anywhere near the accident scene. If not rebutted by plaintiff, this evidence would clearly discredit plaintiff's theory that her son's vehicle was rammed by a police car equipped with push bumpers. In the court's view, however, assuming that the evidence demonstrates that Wakham's vehicle was forced off the road by another vehicle (in particular a white one), this would arguably advance plaintiff's theory of the case, even if the "push bumper" portion of the theory proves to be inaccurate. That is, any evidence that a collision with another vehicle forced her son off the road would disprove other possible causes for the accident, such as Wakham falling asleep at the wheel or having swerved to avoid a deer. At any rate, the court views the evidence in this regard as presenting clear fact issues, and the court concludes that this evidence is best tested by a jury at trial.

Another significant piece of evidence was only discovered by plaintiff after the court made its prior ruling denying the motion to dismiss. Specifically, plaintiff submitted documents labeled as Desoto County Sheriff's Department Dispatcher Logs from the night of the accident. A document stamped "Desoto 0087" appears to show dispatches which occurred on July 6, 2001 (i.e. the night of Wakham's accident) between 8:06 pm and 9:08 pm. Within this time frame, each entry is listed chronologically from the top. "Desoto 0087" shows that, at 8:47 pm, Wakham's license plate number (CUB 192) was called into the dispatch office by deputies "D20" and "D18" under the code number "10-83." Plaintiff represents, based upon conversations with law enforcement personnel, that this number is code for "stopping a suspicious vehicle."

The next two dispatch logs submitted by plaintiff are stamped "Desoto 0088" and "Desoto 0089," and these logs include dispatches which occurred between 6:16 pm to 7:07 pm and 7:11 pm to 8:04 pm respectively, on the night of the accident. Within each of these documents, the dispatches are listed chronologically from the top, but no mention of Wakham's vehicle is contained in either dispatch log. The next mention of Wakham's vehicle is in a document stamped "Desoto 0090," which, like the other documents, includes dispatches listed chronologically from the top. "Desoto 0090" indicates that, at 9:09 pm, a call was made from deputy "D20" (i.e. one of the deputies involved in the prior stop) about an accident (i.e. a "10-50") involving license plate CUB 192 - Wakham's vehicle. Based upon the general chronological order of the dispatch logs, it appears that the log involving her son's apparent stop for a "10-83" should have been labeled "Desoto 0089" rather than "Desoto 0087" as it was apparently submitted to her in discovery by Desoto County. Clearly, it was much more difficult for plaintiff to discover the fact that her son was (apparently) stopped by deputies less than 30 minutes before his accident based upon the very unfortunate numbering of the dispatch logs by Desoto County.

The county's explanation of the dispatch log evidence is that the dispatcher made a simple clerical error in writing down the dispatch, and they have submitted an affidavit from her to this effect. Clearly, this is a very

4

unfortunate "error" on the part of the dispatcher, particularly considering that the county has admitted to other "errors" in investigating the accident in this case. Specifically, the county sent a letter to plaintiff apologetically noting that it had "lost" the accident photos in the instant case after plaintiff repeatedly sought to obtain these photographs. Plaintiff alleges that

> [w]hen plaintiff asked to see photographs that were taken at the time of the accident, she was first told that the photographs were not available because they were being developed. She later found out this was not true because the photographs taken at the scene were Polaroids. After several attempts to get the Sheriff's Department to provide the photographs, she was told that they cannot be found, they will not be found and it would be in her best interest not to come back and ask again.

Plaintiff further alleges that (until she filed the instant lawsuit) defendants initially refused to provide her with information regarding the whereabouts of Officers Bolton and Scallorn, who were the first officers on the scene and who each left the Sheriff's department shortly after the accident. Plaintiff faced an additional obstacle in investigating the accident in this case by virtue of the fact that the stretch of Byhalia Road where the accident occurred was resurfaced mere days after the accident, thus preventing her experts from analyzing the vehicle skid marks.

The sheriff's department appears to have reasonable explanations for the resurfacing of Byhalia Road and for the departure of the officers in question, and the court notes these issues simply to highlight the difficulties faced by plaintiff in investigating the accident in this case. Hoewever, the department has less persuasive explanations for why it gave varying responses to plaintiff's queries regarding the photographs and why it initially refused to provide her information regarding the location of the officers in question. Indeed, plaintiff alleges that sheriff's department employees were willfully rude to her as she attempted to gain information regarding the accident, and this evidence at least arguably support her allegation that the extraordinary series of "errors" and "coincidences" in this case might conceal a more sinister coverup on the part of the sheriff's department rather than simple negligence in processing and investigating the accident in this case.

*Wakham I*, slip op. at 2-7. While noting these strengths in plaintiff's case, this court, as previously stated, nevertheless determined that dismissal of the county defendants was in order because plaintiff was unable to establish that any arguable constitutional violation in this case was the result of official county custom or policy.

5

Since the court's discussion of the facts quoted above, discovery has continued in this case. During this discovery, both plaintiff and defendants have developed information favorable to their case, although it appears that defendants have had particular success in this regard. Perhaps most notably, defendants have produced an affidavit from John W. Herndon, a witness who called in the accident in this case to the 911 operator. In his affidavit, Herndon asserts that he saw a maroon-colored vehicle on the night in question on Byhalia Road, after that vehicle pulled in front of his vehicle from an adjacent road. Herndon further asserts that the maroon vehicle was traveling at a high rate of speed and that he soon lost sight of its tail-lights, but that approximately three minutes later, he came upon a wreck involving a maroon vehicle. It seems clear that this wrecked vehicle belonged to Wakham, but Herndon's affidavit does not state whether this wrecked vehicle was the same one which he saw previously. Indeed, Herndon stated that, prior to the crash, he did not get close enough to the vehicle to determine how many occupants were in it. Significantly, Herndon asserts that he did not see any law enforcement vehicles either before or after witnessing the accident. In addition to Herndon's affidavit, defendants have also produced an expert's report estimating that, based upon Wakham's blood alcohol levels taken following the accident, Wakham had a blood alcohol level of .13 at the time of the accident. The expert report opines that such an intoxication level would have been sufficient to impair his ability to drive.

Without question, the aforementioned evidence serves to strengthen defendants' case, even though Herndon was apparently unable to get a close enough look at the car which pulled in front of him to determine if it was Wakham's vehicle. At the same time, defendants' continued inability to account for Stephanie Guest's testimony remains arguably their greatest obstacle in

seeking dismissal of this case on summary judgment. Defendants do not suggest in their brief that this witness is lying or that she is an interested party, and the court is required at the summary judgment stage to assume that Guest is not lying and that she is not mistaken in her testimony. Indeed, it is hard to imagine how Guest could have mistakenly believed that she witnessed two sheriff's vehicles following a car similar to Jonathan Wakham's shortly before his accident and approximately a mile from where the accident occurred.

This court would have hoped that, over three years since the original action in this litigation was filed, defendants would be able to present this court with some explanation for the events allegedly witnessed by Guest. Instead, Burgess and Bolton merely argue as follows with regard to Guest's testimony:

> Ms. Guest was deposed on March 3, 2003, and nowhere in her testimony does she state that she saw law enforcement vehicles following Jonathan Wakham. In fact, Guest testified as follows:
> Q: You could not tell us who was driving that vehicle, could you?
> A: No.
> Q: You can't swear that the vehicle you saw was ever in an accident on that night, can you?
> A: The only thing I remember sticking out in my head besides the color was there was a light on the - the rear, like beside the window on the back. And I did not follow the car, though and see it in a wreck, no.

In the court's view, defendants largely miss the point with regard to the relevance of Guest's testimony. While it is understandable that none of the defendants would have clear evidence regarding the driver of the maroon vehicle, neither the Desoto County Sheriff's Department in its prior motion and brief, nor Burgess and Bolton in their motion, have provided this court with any explanation for which sheriff's deputies might have been witnessed by Guest.

In discovery, defendants identified a handful of deputies who were working on the night

in question, and it should have presented little difficulties to speak with them and ascertain whether any of them could explain the events allegedly witnessed by Guest. Defendants Bolton and Burgess have managed to testify regarding their activities on the night in question, and it is unclear to this court why the events described in Guest's testimony remain a mystery. At the same time, the court is aware this is an action asserted against individual officers, and whether there exists sufficient proof to create fact issues as to each officer will, of course, depend upon facts particular to each defendant. The mere fact that there may be proof giving rise to suspicion that *some* sheriff's deputies were involved in the death of plaintiff's son does not indicate that fact issues exist with regard to the potential liability of each defendant.

As to defendants Bolton and Burgess, the Sheriff's department's own dispatch logs plainly state that Officer Bolton called in the license plate for Wakham's vehicle under the 10-83 code for stopping a suspicious vehicle shortly before the accident in this case. Moreover, defendant Burgess testified that he assisted Bolton in making an unrelated stop around the same time, and the record reveals that these officers were the first to arrive on the scene of the Wakham accident, thus suggesting that they were working together on the night in question. Defendants assert that this dispatch log entry was the result of a transcription error, and they provide affidavits in support of this assertion. These affidavits do not appear unreliable on their face, and they might well persuade a jury at trial. However, it seems clear to this court that any consideration of the reliability of these affidavits and witnesses would be a fact issue.[1]

---

[1] The court would also note that, in response to an interrogatory, defendants Desoto County Sheriff's Department and Desoto County Metro Narcotics conceded that:
> To the best of our information, nobody attempted to coerce Jonathan Wakham to become an informant. On information and belief, Jonathan Wakham was offered the opportunity to become an informant. He declined the offer.

8

For her part, plaintiff has produced additional evidence which arguably casts doubt upon defendants' assertion that there was only one Desoto County law enforcement vehicle which had push bumpers on the night in question. The evidence on this issue is rather involved and need not be discussed at this juncture. At any rate, it is arguable that the issue of whether a particular officer's vehicle had push bars is to some extent irrelevant, for summary judgment purposes, due in part to inconsistencies in the arguments and proof offered by defendants on this issue. On the one hand, defendants contend that law enforcement involvement in Wakham's death is disproven by the absence of Desoto County law enforcement vehicles with push bars. As noted previously, plaintiff now disputes this evidence. On the other hand, Burgess and Bolton have produced an expert report from Dr. Craig Depken, a mechanical engineer, which report states that:

> Inspection of the bumper cushions indicate that they have been depressed. However, the depression was not distributed across the bumper. The right side bumper cushion was depressed further than the left side bumper cushion. The observed depression of the rear bumper cushions would not provide sufficient force to create an out-of-control condition as described by plaintiff's experts.

It would appear to this court that this expert report favors plaintiff, as far as establishing fact issues on motion for summary judgment. That is, Dr. Depken's report concedes that there are indentations in the rear bumper, but it asserts that one side has a greater indentation than the other. This would at least arguably support a conclusion that, while there were, in fact, indentations demonstrating contact from the rear, these indentations were not consistent with

---

In the court's view, this admission is arguably a significant one in that it arguably provides a motive for there to have been animosity towards Jonathan Wakham on the part of Desoto County Sheriffs and/or Metro Narcotics officers. Clearly, plaintiff's "conspiracy theory" is much more plausible in a case in which there is some pre-existing reason for animosity between law enforcement and her son than in a case where there were no such reason.

9

contact with dual push bars from the rear.  This, in turn, would arguably greatly widen the pool of potential vehicles which might have been involved in the accident.

Moreover, defendants have produced no evidence, such as from acquaintances of Wakham, suggesting that any indentations were present on Jonathan Wakham's vehicle prior to the accident.  The court, through its staff, has been informed that Myra Wakham testified in her deposition that no such indentations were present on her son's vehicle earlier on the day of the accident.  This deposition testimony does not appear to have been included in plaintiff's summary judgment exhibits, however.  While it is not the place of this court to try the parties' cases for them, it is submitted that further inquiries should be made during discovery regarding whether Wakham's vehicle had any indentations prior to the accident in question.  These indentations were obviously quite visible, as evidenced by an affidavit from Zack Sims, who testified that he was the second witness on the scene.  Simms testified that he noticed the dents in the back of the vehicle and testified "I wondered about it.  I wondered why there was why [sic] dents in the - the back of it."  Given that the indentations on Wakham's vehicle made such an impression on a witness to the accident, it seems implausible that friends and acquaintances of Wakham would not have noticed them prior to the accident, if they existed.

Defendants' theory of this case, as supported by Herndon's affidavit, appears to be that Wakham simply lost control of his vehicle in a one-car accident, due to his intoxication, speeding, and poor brakes on his vehicle.  Obviously, this theory would be undercut by evidence indicating that plaintiff's vehicle had very noticeable indentations on its rear bumper immediately following the accident but that it had none prior to the accident.  Indeed, defendant's own expert does not dispute that the indentations are present, although he contends that the force which

10

caused the indentations should not have been sufficient to cause the car to leave the road. This does not resolve the question, however, of why, if this case truly involves a one-vehicle accident, the indentations were present at all, assuming that they were not present prior to the accident.

While the court notes the foregoing fact issues for the record, it should also be noted that plaintiff will face a rather heavy burden of proof in demonstrating that any particular officer committed a Fourth Amendment violation in running her son off of the road. To establish such a Fourth Amendment violation, plaintiff would presumably need to produce evidence demonstrating not only that a particular officer was involved in the accident, but also that it was something more than an accident resulting from a legitimate exercise of law enforcement powers.[2] Clearly, Fourth Amendment violations are not established in every case in which officers are involved in a motor vehicle accident, and each officer is entitled to a qualified immunity defense in this case. In order to survive a particular defendant's motion to dismiss on the basis of qualified immunity, plaintiff will need to demonstrate, with regard to her Fourth Amendment claims, that these officers violated clearly established constitutional standards of which a reasonable officer would have been aware. This may be a tall order for plaintiff, considering that she has no clear evidence demonstrating exactly which officers might have been involved in her son's accident or how the accident came about.

Plaintiff appears to suspect defendant Terry of being involved in the actual accident in this case, and her brief in opposition to summary judgment includes apparently inadmissible hearsay statements quoting her son as having stated shortly before his death that Officer Terry

---

[2]As noted previously, defendant has produced evidence suggesting that Wakham was intoxicated at the time of the accident.

told him that he was going to "get him." However, plaintiff appears to have no evidence at this juncture placing Terry at the scene of the accident in this case, and the Desoto County dispatch logs apparently support Terry's deposition testimony that he was at the police station that night and was not dispatched to the scene of the accident. While the court will readily agree that plaintiff has submitted intriguing evidence in this case which raises the question of whether unnamed law enforcement officers were involved in her son's death, this evidence, standing alone, is insufficient to demonstrate fact issues as to whether a specific officer committed Fourth Amendment violations by running her son off the road.

Plaintiff notes in her brief that she suspects that Officer Terry was the unnamed caller who, according to county 911 transcripts, called in the accident using jargon familiar to law enforcement officers. The court has been notified that the actual recordings of these 911 calls have only recently been made available, and plaintiff will thus have an opportunity to test her theory that the unnamed 911 caller was actually Officer Terry. If the evidence does not support plaintiff's theory in this regard, however, then it would appear that she will lack any evidence contesting Terry's evidence that he was nowhere near the scene of the accident on the night in question. Moreover, if plaintiff fails to produce evidence placing Officer Terry near the scene of the accident, then she may well find it difficult to argue alternatively that some other officers, such as Deputies Bolton and Burgess, actually committed Fourth Amendment violations by running her son off the road.

In light of the foregoing, is should be apparent that plaintiff may (depending in part upon the contents of the 911 tape) find it difficult to survive qualified immunity defenses with regard to any alleged Fourth Amendment violations in this case. It is arguable, however, that plaintiff

may face a somewhat easier burden of proof with regard to her claim that certain defendants may have committed Fourteenth Amendment violations by covering up law enforcement involvement in her son's death. Indeed, the burden of demonstrating exactly what happened in the accident in this case would appear to be considerably lower with regard to plaintiff's Fourteenth Amendment claims than with regard to her Fourth Amendment claims. At any rate, the record reveals that defendants Terry, Brown and Merideth have only fairly recently been brought into this litigation, and it is apparent that they have not been given an opportunity to conduct extensive discovery in this case.

Terry asserts that he has not been able to conduct any discovery at all, and plaintiff has notified this court that she would like to depose additional witnesses relevant to her claims against Terry. Moreover, defendants Brown and Meredith have filed a motion for summary judgment relying largely upon principles of law, with little discussion of the facts of this case as they apply to these defendants. It thus appears that these defendants likewise need an opportunity to conduct additional discovery, and the court suggests that any future motions for summary judgment which they might file include a more extensive discussion of the facts of this case, as they pertain to these defendants. Finally, the court would note once again that a playing of the 911 tape at issue in this case has only recently been made possible, and the court concludes that the parties should be given an opportunity to incorporate this information in their respective motions. This court had hoped to move this litigation along at a more rapid pace, but judicial economy may not take precedence over the right of the parties to conduct adequate discovery.[3]

---

[3]As to plaintiff's claims against defendants Burgess and Bolton, the parties may, if they so choose, utilize this additional discovery period to shed light upon some of the issues raised by the court in its order.

In light of the foregoing, it is ordered that the motions [36-1, 78-1, 92-1] for summary judgment and/or to dismiss presently before the court are dismissed without prejudice. The court requests that Magistrate Judge Davis set new discovery and motion deadlines consistent with this order.

SO ORDERED, this the 23rd day of February, 2006.

                                            **/s/ Michael P. Mills**
                                            **UNITED STATES DISTRICT JUDGE**