# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF MISSISSIPPI
# EASTERN DIVISION

**MYRA WAKHAM**                                                            **Plaintiff**

vs.                                                         Civil Action No. 1:04CV207

**GLENN BURGESS, WILLIAM BOLTEN,
CHARLIE BROWN, DAVID MERIDETH, and
CHARLES TERRY, in their individual capacities**            **Defendants**

## ORDER

This cause comes before the court on the motions of various defendants for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiff Myra Wakham has responded in opposition to the motions, and the court, having considered the memoranda and submissions of the parties, concludes that the motions are well taken and should be granted.

Plaintiff Myra Wakham filed this action against the Desoto County Sheriff's Department, Desoto County Metro Narcotics Unit, Desoto County, Mississippi, the City of Hernando Police Department, as well as various individual officers (some of whom were only recently added to the litigation), seeking recovery for alleged due process violations arising out of the Desoto County Sheriff's Department's investigation into (and possible role in) the death of her son, Jonathan W. Wakham. On July 7, 2001, Wakham was killed in an (apparent) one-vehicle accident on Byhalia Road in Desoto County. In her original complaint, plaintiff asserted a number of allegations of possible involvement, or knowledge, of Sheriff's Department personnel in her son's death, including that:

    - The Desoto County Sheriff's Department "claims that it has lost the photographs that it took concerning the incident" and that it "does not know the whereabouts of

> the two officers" who were at the scene of the accident.
> - Because of the damage apparently done to the vehicle of the deceased, it appears unlikely that the vehicle voluntarily left the road, and it appears likely that the vehicle was being pursued.
> - Prior to his death, Wakham had related to plaintiff that narcotics officers of the "defendant" had been placing pressure upon him to become an informant.
> - An eye witness, Stephanie Guest, has informed plaintiff that she saw a vehicle matching the description of Wakham followed closely by two Sheriff's department cars travelling at a high rate of speed. She made this observation approximately two minutes before plaintiff's son left the highway and crashed.
> - Based upon the above facts, there is probable cause to believe that the Desoto County Sheriff's Department's deputies were involved in some manner in Wakham's death.

Based upon these allegations, plaintiff filed suit in this court on July 3, 2002, seeking recovery for violations of her constitutional "liberty" rights. On November 8, 2004, this court granted the motions of the county defendants for summary judgment, based upon a finding that plaintiff had failed to produce evidence of any official county custom or policy so as to impose municipal liability under *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-2038, 56 L. Ed. 2d 611 (1978). The court subsequently dismissed the City of Hernando Police Department, and the sole remaining defendants before the court are current or former individual officers sued in their individual capacities.

In its prior order granting the county defendants' motion for summary judgment, this court discussed in detail the facts which, in its view, served to establish fact issues regarding whether there was law enforcement involvement in Jonathan Wakham's death. Specifically, this court wrote as follows:

> The court's reluctance to dismiss this action arises from this court's belief that plaintiff has submitted proof which, at the least, establishes genuine fact issues regarding a possible cover-up by sheriff's department employees of their involvement in the accident which led to her son's death. Perhaps the strongest evidence of the possible involvement of sheriff's department employees in the

accident in this case is the testimony of witness Stephanie Guest. Guest testified in her deposition that she observed a vehicle matching the description of Wakham's vehicle being followed by two Desoto County sheriff's vehicle only minutes before the crash and approximately a mile from the accident site. Specifically, Guest testified as follows in her deposition:

> Anyway, as I approached the four-way stop, I saw another vehicle in front of me through the intersection, and I saw another car approaching from my right-hand side. When the car stopped at the stop sign, I noticed that it was a dark maybe burgundy, red, plum color, somewhere around in there. It was two doors, so I just felt that it was a mid-sized car. The car went - passed in front of me. As the car got in front of me, I noticed another set of headlights coming, so I just stayed stopped at the stop sign and there were two sheriff patrol cars coming behind. Neither one of them stopped, they went on through. And I just sat there and waited. I remember I had a very uneasy feeling for some reason, so I just sat there for a few minutes.

Guest testified that the sheriff's patrol cars were following within "a few seconds" of the dark-colored vehicle and that it "looked to me as if they were intended to keep up with the car, but not in a pursuit-type thing." Guest testified that, while she was originally planning to travel the route on Byhalia Road taken by the patrol cars, she elected against it, deciding that, since she had her children with her, she did not wish to "get in the middle of something." Defendants do not contest that Wakham's vehicle was a maroon-colored, two-door Cadillac Coupe Deville, nor do they contest that the accident occurred on a stretch of Byhalia Road approximately a mile from the point where, Guest testified, she observed sheriff's patrol cars closely following a vehicle similar to that driven by Wakham.

Plaintiff has also submitted evidence, including testimony from accident reconstructionist Lamon Griggs, that her son's vehicle was forced off the road after it was rammed from the rear by a white car equipped with bumper guards similar to those used by law enforcement patrol cars. Plaintiff also notes that Mississippi Highway Patrol Sergeant Peter T. Clinton, a Certified Accident Reconstructionist, concluded in his (apparently) official report for the Mississippi Highway Patrol that the trunk area on Wakham's vehicle "displayed two indentations that measured approximately two feet between each indentation" and that these indentations appeared to have been made from a white vehicle with protruding bumper guards or a vehicle mounted with a push bumper.

Defendants have cast serious doubt upon the "push bumper" portion of plaintiff's proof, submitting that only one of their vehicles was fitted with a push bumper and that this vehicle was not anywhere near the accident scene. If not rebutted by plaintiff, this evidence would clearly discredit plaintiff's theory that her son's vehicle was rammed by a police car equipped with push bumpers. In the court's view, however, assuming that the evidence demonstrates that Wakham's

3

vehicle was forced off the road by another vehicle (in particular a white one), this would arguably advance plaintiff's theory of the case, even if the "push bumper" portion of the theory proves to be inaccurate. That is, any evidence that a collision with another vehicle forced her son off the road would disprove other possible causes for the accident, such as Wakham falling asleep at the wheel or having swerved to avoid a deer. At any rate, the court views the evidence in this regard as presenting clear fact issues, and the court concludes that this evidence is best tested by a jury at trial.

Another significant piece of evidence was only discovered by plaintiff after the court made its prior ruling denying the motion to dismiss. Specifically, plaintiff submitted documents labeled as Desoto County Sheriff's Department Dispatcher Logs from the night of the accident. A document stamped "Desoto 0087" appears to show dispatches which occurred on July 6, 2001 (i.e. the night of Wakham's accident) between 8:06 pm and 9:08 pm. Within this time frame, each entry is listed chronologically from the top. "Desoto 0087" shows that, at 8:47 pm, Wakham's license plate number (CUB 192) was called into the dispatch office by deputies "D20" and "D18" under the code number "10-83." Plaintiff represents, based upon conversations with law enforcement personnel, that this number is code for "stopping a suspicious vehicle."

The next two dispatch logs submitted by plaintiff are stamped "Desoto 0088" and "Desoto 0089," and these logs include dispatches which occurred between 6:16 pm to 7:07 pm and 7:11 pm to 8:04 pm respectively, on the night of the accident. Within each of these documents, the dispatches are listed chronologically from the top, but no mention of Wakham's vehicle is contained in either dispatch log. The next mention of Wakham's vehicle is in a document stamped "Desoto 0090," which, like the other documents, includes dispatches listed chronologically from the top. "Desoto 0090" indicates that, at 9:09 pm, a call was made from deputy "D20" (i.e. one of the deputies involved in the prior stop) about an accident (i.e. a "10-50") involving license plate CUB 192 - Wakham's vehicle. Based upon the general chronological order of the dispatch logs, it appears that the log involving her son's apparent stop for a "10-83" should have been labeled "Desoto 0089" rather than "Desoto 0087" as it was apparently submitted to her in discovery by Desoto County. Clearly, it was much more difficult for plaintiff to discover the fact that her son was (apparently) stopped by deputies less than 30 minutes before his accident based upon the very unfortunate numbering of the dispatch logs by Desoto County.

The county's explanation of the dispatch log evidence is that the dispatcher made a simple clerical error in writing down the dispatch, and they have submitted an affidavit from her to this effect. Clearly, this is a very unfortunate "error" on the part of the dispatcher, particularly considering that the county has admitted to other "errors" in investigating the accident in this case. Specifically, the county sent a letter to plaintiff apologetically noting that it had "lost" the accident photos in the instant case after plaintiff repeatedly sought to

4

> obtain these photographs. Plaintiff alleges that
>> [w]hen plaintiff asked to see photographs that were taken at the time of the accident, she was first told that the photographs were not available because they were being developed. She later found out this was not true because the photographs taken at the scene were Polaroids. After several attempts to get the Sheriff's Department to provide the photographs, she was told that they cannot be found, they will not be found and it would be in her best interest not to come back and ask again.
>
> Plaintiff further alleges that (until she filed the instant lawsuit) defendants initially refused to provide her with information regarding the whereabouts of Officers Bolton and Scallorn, who were the first officers on the scene and who each left the Sheriff's department shortly after the accident. Plaintiff faced an additional obstacle in investigating the accident in this case by virtue of the fact that the stretch of Byhalia Road where the accident occurred was resurfaced mere days after the accident, thus preventing her experts from analyzing the vehicle skid marks.
>
> The sheriff's department appears to have reasonable explanations for the resurfacing of Byhalia Road and for the departure of the officers in question, and the court notes these issues simply to highlight the difficulties faced by plaintiff in investigating the accident in this case. Hoewever, the department has less persuasive explanations for why it gave varying responses to plaintiff's queries regarding the photographs and why it initially refused to provide her information regarding the location of the officers in question. Indeed, plaintiff alleges that sheriff's department employees were willfully rude to her as she attempted to gain information regarding the accident, and this evidence at least arguably support her allegation that the extraordinary series of "errors" and "coincidences" in this case might conceal a more sinister coverup on the part of the sheriff's department rather than simple negligence in processing and investigating the accident in this case.

*Wakham I*, slip op. at 2-7. While noting these strengths in plaintiff's case, this court, as previously stated, nevertheless determined that dismissal of the county defendants was in order because plaintiff was unable to establish that any arguable constitutional violation in this case was the result of official county custom or policy.

In an order dated February 23, 2006, this court dismissed motions for summary judgment filed by individual officers in this case so that additional discovery could be conducted. In so

5

ruling, this court noted the difficulties that plaintiff would likely face in establishing genuine issues of fact as to her claims against any particular defendant. Specifically, this court wrote as follows:

> [I]t should also be noted that plaintiff will face a rather heavy burden of proof in demonstrating that any particular officer committed a Fourth Amendment violation in running her son off of the road. To establish such a Fourth Amendment violation, plaintiff would presumably need to produce evidence demonstrating not only that a particular officer was involved in the accident, but also that it was something more than an accident resulting from a legitimate exercise of law enforcement powers. Clearly, Fourth Amendment violations are not established in every case in which officers are involved in a motor vehicle accident, and each officer is entitled to a qualified immunity defense in this case. In order to survive a particular defendant's motion to dismiss on the basis of qualified immunity, plaintiff will need to demonstrate, with regard to her Fourth Amendment claims, that these officers violated clearly established constitutional standards of which a reasonable officer would have been aware. This may be a tall order for plaintiff, considering that she has no clear evidence demonstrating exactly which officers might have been involved in her son's accident or how the accident came about.

Slip op. at 11. While noting these difficulties, the court concluded that the parties needed additional time to perform discovery, and the court accordingly dismissed defendants' motions for summary judgment without prejudice so that this discovery might be performed. The parties have now performed this additional discovery, and the individual defendants have once against filed summary judgment motions.

## **ANALYSIS**

Counsel for plaintiff and defendants have all performed diligent and admirable work in conducting the additional discovery and in briefing this motion, and the court appreciates their efforts. Prior to issuing its ruling, the court would note once again the tragic circumstances of this case, which involve the death of plaintiff's son. At the same time, the court has before it

individual police officers who adamantly insist that they had nothing to do with the death of plaintiff's son and that they did not participate in any "cover up" involving his death.

The latest round of discovery did not clarify all of the factual uncertainties in this case, but this discovery does make it seem highly likely that the death of plaintiff's son was a tragic accident which did not involve law enforcement personnel. More importantly for the purposes of the instant motion, the latest discovery made it abundantly clear that plaintiff does not have sufficient evidence establishing fact issues as to whether any of the individual defendants before this court were either involved in the death of plaintiff's son or that they participated in any alleged cover-up following his death. In any action in which plaintiff seeks to impose individual liability against an officer, it is plainly insufficient for plaintiff to raise intriguing or mysterious facts which raise the mere possibility of a cover-up by unnamed officers. Rather, plaintiff must produce evidence which establishes genuine fact issues as to whether any individual officer participated in such wrongdoing. In the court's view, plaintiff has failed to present such evidence in this case.

After reviewing the discovery conducted in recent months, it is apparent that defendants have presented additional proof which casts doubt upon what was formerly one of plaintiff's most powerful pieces of evidence, namely the dispatch log which appeared to show that, at 8:47 pm on the night of the accident, Officer Burgess had radioed in the license plate number of the vehicle of plaintiff's son under the code for "stopping a suspicious vehicle." This evidence had raised questions in this court's mind as to whether Officer Burgess might have been untruthful in testifying that he had no contact with Jonathan Wakham's vehicle prior to the accident, which occurred shortly after 9 p.m. This evidence likewise appeared to raise questions regarding

Officer Bolton's testimony, given that he had testified that he was assisting Officer Burgess on a traffic stop shortly before heading to the Wakham accident site.  The court deemed this evidence particularly significant in light of the prior deposition testimony of witness Stephanie Guest that she had seen a vehicle matching the description of Wakham's vehicle being followed by law enforcement vehicles shortly before the accident.

Defendants had previously submitted an affidavit from dispatcher Debbie McGhee in which McGhee asserted that she had inadvertently logged the tag number for Wakham's vehicle at the wrong time on the dispatch log.  While this affidavit, standing alone, was arguably insufficient to remove the doubts caused by the dispatch log itself, defendants have since buttressed McGhee's affidavit by sending the actual dispatch tapes to audio expert Paul Ginsberg at Professional Audio Laboratories, who transferred the tapes to CD format. Defendants have filed the actual CDs with this court, and they argue, without refutation from plaintiff, that these CDs show that Jonathan Wakham's license plate number was only called in once on July 6, 2001, at 9:23 p.m.   This very significant piece of evidence thus strongly supports McGhee's affidavit and does appear to indicate that the entry on the dispatch log showing that Wakham's tag number had been radioed in at 8:47 p.m. was, in fact, a transcription error. Defendants have also buttressed McGhee's affidavit with a report from the National Criminal Information Center (NCIC) confirming that Wakham's tag number was only called in once, at 9:23 p.m. In their brief, defendants also note that the aforementioned evidence suggests that, shortly before heading to the Wakham accident site, Officers Bolton and Burgess were actually involved in stopping an unrelated vehicle, with a tag number different than that of Wakham's vehicle.

In the court's view, the dispatch log evidence was plaintiff's only evidence which even arguably served to create fact issues as to whether any specific deputies (namely Officers Bolton and Burgess) might have been involved in a cover-up of the death of plaintiff's son. The court is aware that, at the summary judgment stage, it is required to interpret the evidence in the light most favorable to plaintiff, as the non-moving party. Nevertheless, the court concludes that the evidence before the court now overwhelmingly indicates that Jonathan Wakham's tag number was not, in fact, called in at 8:47 p.m, as the dispatch log appeared to suggest.[1] The summary judgment standard does not require this court to ignore evidence which overwhelmingly supports a particular point, and this court is strongly disinclined to require Officers Bolton and Burgess to face trial when the evidence strongly indicates that they were merely doing their jobs on the night of Wakham's death and that they had nothing to do with his death or any alleged coverup.

The court would further note that the notion that Stephanie Guest might have witnessed Desoto County deputies following Wakham's vehicle shortly before the accident has now been contradicted by the affidavit of John W. Herndon, who called in the accident to the 911 operator. In his affidavit, Herndon asserts that he saw a maroon-colored vehicle on the night in question on Byhalia Road, after that vehicle pulled in front of his vehicle from an adjacent road. Herndon further asserts that the maroon vehicle was traveling at a high rate of speed and that he soon lost sight of its tail-lights, but that approximately three minutes later, he came upon a wreck involving a maroon vehicle. It seems very likely that this wrecked vehicle belonged to Wakham, but

---

[1] The court would also note that, even if it were to find fact issues as to whether Wakham's vehicle was called in at 8:47 p.m. (which it does not) then this would still not be direct proof of any coverup, and it would certainly not suffice to establish fact issues regarding plaintiff's right to recover under Fifth Circuit authority in this context. *See Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983).

Herndon's affidavit does not state whether this wrecked vehicle was the same one which he saw previously. Indeed, Herndon stated that, prior to the crash, he did not get close enough to the vehicle to determine how many occupants were in it. Significantly, Herndon asserts that he did not see any law enforcement vehicles either before or after witnessing the accident.

The 911 dispatch recordings confirm that Herndon called in the accident to the 911 operator, and it thus appears very likely that Herndon, but not Guest, witnessed Wakham's vehicle shortly before the fatal accident. Indeed, plaintiff now concedes that Guest is less than certain regarding the exact time at which she observed sheriff's vehicles following another vehicle, and defendants have suggested that Guest may have actually witnessed sheriff's vehicles heading towards the scene of the accident. While it is not entirely clear what Guest witnessed, it is beyond dispute that Guest's testimony loses a great deal of force in light of Herndon's affidavit. Clearly, Herndon's description of events is tied to the actual accident involving Wakham's vehicle with much greater reliability than Guest's testimony, given that Herndon undisputably called in the accident shortly after it happened. Indeed, Guest conceded in her deposition that she may have merely witnessed officers reporting to the scene of the accident, and defendants note in their brief that the timing of Herndon's 911 call, along with Guest's testimony that she left her house around 9:08 p.m. suggest that this is likely the case. The court would note that the timing of Guest's testimony is based upon her recollection of having looked at her clock prior to leaving home, and the timing of Guest's testimony is thus far less reliable than the 911 records relating to Herndon's call.

The court would also note that yet another piece of evidence which at one time appeared somewhat compelling now appears much less favorable to plaintiff's position. That is, with

10

regard to the indentations on the rear of Jonathan Wakham's vehicle, plaintiff now concedes that these indentations may have actually been made by the vehicle which towed Wakham's vehicle. Specifically, plaintiff now concedes that

> [t]he push bumper indentations may have been made earlier or may have been made by the wrecker towing it to Michael's Garage, then Arkansas, then back to Mississippi. It is for the jury to determine what the truth is and a reasonable jury could determine that the indentations were made by a push bumper.

Previously, the presence of the indentations on the rear of Wakham's vehicle was one of the unexplained mysteries of this case, and the fact that plaintiff now concedes that these indentations may be the result of the actions of a towing vehicle is thus significant. While it is very unlikely that the unexplained indentations, standing alone, would serve to create fact issues regarding the liability of any particular defendant in this case, the fact remains that the evidence in this context appears far less helpful to plaintiff's case than it did at one time.

In sum, the court concludes that the recent discovery in this case serves to cast doubt upon virtually all of plaintiff's evidence in this case. It is understandable that plaintiff would have originally suspected police involvement and/or a coverup in her son's death, based upon the facts as they appeared prior to the lengthy discovery process in this case. However, the trial process is a search for truth, and the court concludes that this process has produced evidence which strongly suggests that the death of Wakham's son was, in fact, a tragic accident. Indeed, defendants recently submitted evidence showing that Jonathan Wakham had an elevated blood alcohol level, and, to reiterate, Herndon indicated in his affidavit that the maroon-colored vehicle which passed him had been speeding. The newly discovered evidence strongly supports defendants' theory that Wakham's death was accidental, and the evidence which at one time

11

appeared to raise the possibility of a police cover-up has, in the court's view, now been refuted.

The court has before it five individual defendant officers, and plaintiff has failed to present evidence establishing fact issues as to whether any of them was either involved in her son's death or participated in any alleged coverup. Indeed, plaintiff's strongest evidence that any defendant might have had a motive to harm her son relates to defendant Terry (based on alleged prior conflicts between Terry and her son), yet the evidence (including from dispatch logs) in this case is overwhelming that Terry was nowhere near the site of her son's accident on the night in question. The only evidence which at one time arguably pointed to the role of any particular defendants in a coverup is that involving the dispatch logs, which at one time appeared to raise questions regarding the actions of Officers Burgess and Bolton. As discussed previously, however, recently discovered evidence clearly supports the defendants' position that this dispatch log entry was the result of a transcription error on the part of the dispatcher.

In light of the foregoing, the court concludes that plaintiff has failed to raise genuine fact issues regarding the potential liability of any defendant for a constitutional (or any other legal) violation in this case.[2] The court therefore concludes that defendants' motions for summary judgment are well taken and are due to be granted.

It is therefore ordered that defendants' motions for summary judgment [139-1, 141-1,

---

[2]The court would also note that, even if she had proof establishing fact issues regarding a potential coverup, she would still face very difficult legal obstacles in seeking to recover under *Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983) for wrongful interference with her access to the state courts to pursue a tort claim surrounding her son's death. That is, given that plaintiff offers nothing more than speculation regarding the accident which claimed her son's life, she would likely find it very difficult to prove that she would have had a right to recover under state law for any such accident.

12

143-1, 145-1, 147-1, 150-1] are granted.

A separate judgment will be issued this date in accordance with Fed. R. Civ. P. 58.

SO ORDERED, this the 16th day of November, 2006.

       **/s/ Michael P. Mills**
       **UNITED STATES DISTRICT JUDGE**